UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| ROBERT MYERS, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) Case No. 10 C 6726 |
| FERRELLGAS, INC., | ) Judge John W. Darrah |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Ferrellgas, Inc.'s ("Ferrellgas") Motion for Summary Judgment. Plaintiff Robert Myers filed a three-count Complaint in the Circuit Court of Will County on September 3, 2010, alleging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 (Count I); violation of the Illinois Whistleblower Act ("Whistleblower Act"), 740 ILCS § 174/20 (Count II); and retaliatory discharge under Illinois state law (Count III). Ferrellgas removed the action to this Court on October 19, 2010, on the basis of federal-question and diversity jurisdiction.

Myers concedes that he has failed to support his age-discrimination claim. (Resp. at n.1.) Therefore, Ferrellgas's Motion for Summary Judgment is granted with respect to Count I. Because the Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(c), presently before the Court is Ferrellgas's Motion for Summary Judgment with respect to Myers' state-law claims (Counts II and III).

## BACKGROUND

The following facts are taken from the Parties' statements of undisputed material facts submitted in accordance with Local Rule for the Northern District of Illinois ("Local Rules") 56.1.[1] Ferrellgas has filed a "Reply" to Myers' response to Ferrellgas's statement of facts. The Local Rules do not permit a moving party to provide a reply to a response to the statement of facts submitted by the opposing party. Therefore, Ferrellgas's Reply is not considered.

During all relevant times, Myers was a citizen of Illinois. (Compl. ¶ 1.) Ferrellgas is a Delaware corporation, (*Id.* ¶ 2), and its principal executive office is in Overland Park, Kansas. (*See* 3/9/12 U.S. Securities and Exchange Commission Form 10-Q, Ferrellgas.)[2] Myers seeks damages greater than $75,000. This Court has diversity jurisdiction of Myers' state-law claims pursuant to 28 U.S.C. § 1332(c)(1).

*Myers' Employment from 2004 to 2008*

Ferrellgas provides propane to customers throughout the country. Def.'s 56.1(a)(3) ¶ 1.) Blue Rhino is a part of Ferrellgas, and its primary business is providing propane tanks for gas grills by placing tank exchange displays in front of retail stores and

---

[1] Local Rule 56.1(a)(3) requires the party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Rule 56.1(b)(3) then requires the nonmoving party to admit or deny each factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to dispute the facts set forth in its opponent's statement in the manner required by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

[2] The Court may take judicial notice of matters of public record. *Patten v. N. Trust Co.*, 703 F. Supp. 2d 799, 803 n.2 (N.D. Ill. 2010) (citing *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080-81 (7th Cir. 1997)).

other customers. (*Id.*) Blue Rhino's business is seasonal; it is busiest during grilling season from May through August and trails off after Labor Day. (*Id.*)

Myers began working for Blue Rhino in May 2004 as the plant manager of Blue Rhino's production facility in Channahon, Illinois. (*Id.* ¶ 2.) In December 2006, Myers was promoted to General Manager, overseeing the production and distribution of Blue Rhino propane cylinders for territories in Illinois, Iowa, and Wisconsin. (*Id.* ¶ 3.) In the summer of 2007, Ron Snyder, the Director of Operations, became Myers' supervisor. (*Id.* ¶ 4.) Because of restructuring throughout Blue Rhino, Myers' duties changed to overseeing only the distribution of cylinders and not production. (*Id.*) In September 2007, Myers received a positive performance review, stating in part, "Rob is an excellent general manager who has shown the ability to hit his financial commitment as well as his operational commitments." (Pl.'s 56.1(b)(3)(C) ¶ 1.) In late 2007/early 2008, Ferrellgas eliminated the General Manager position in Minnesota and Myers' responsibilities were expanded to include Minnesota, and Myers received a pay increase. (Def.'s 56.1(a)(3) ¶ 6.)

Around late 2007, Myers' wife began undergoing medical testing, and around February 2008, she was diagnosed with cancer; she began cancer treatments that lasted into July 2008. (*Id.* ¶ 7.) During this same time, Myers was also attending law school online. (*Id.*)

From 2004 to early 2008, Jason Peck, the Delivery Manager, who was responsible for routing all deliveries of propane tanks to Blue Rhino customers, reported to Myers. (*Id.* ¶ 2, 3.) Peck put in his notice of resignation towards the end of January 2008 and left around early March 2008. (*Id.* ¶ 9.) Myers hired Keith Romac to replace Peck. (*Id.*)

3

In routing deliveries, Blue Rhino's goal is to maintain customer service by keeping tanks available for consumers to exchange, while being efficient in making as few trips as necessary and grouping drivers' stops close together. (*Id.* ¶ 8.) To help accomplish this, Blue Rhino uses a software program called Roadnet to help determine the best routes for deliveries. (*Id.*) Before March 2008, Myers had not used Roadnet. (*Id.* ¶ 10.) Myers was told by his supervisors since January 2007 to learn Roadnet and to train with Peck to ensure that the organization could function in Peck's absence and to give Myers a better understanding of Blue Rhino's routing tools and processes. (*Id.*)

Before the May 2008 peak season, Myers was instructed to focus on being sufficiently staffed, and there were ongoing discussions about how to get more drivers in the territory. (*Id.* ¶ 11.) In December 2007, Snyder had given Myers some possible sources for drivers beyond advertisements. (*Id.*) In March, Snyder reiterated that overtime was high and that Myers needed to "get staffed up" to manage it down. (*Id.*) Snyder noted that when busy season comes, "that's when your preparedness is very clear," and on April 9, Snyder again reiterated that with peak season just around the corner, "[w]e've 'got' to get adequately staffed!" (*Id.*)

In Myers' April 1, 2008 performance review, Snyder noted that Myers was below the company target of 92 percent for delivery service for August 2007 through March 2008 and that his delivery costs were higher than budgeted everywhere but Iowa. (*Id.* ¶ 12.) Snyder also wrote, "Rob your effort has been outstanding, just need to focus and take action to drive improved results on key metrics; Service, Installation, Response Time, and meeting timelines for task. I feel fortunate to have you on the team and look for forward to a strong finish for FY08." (Pl.'s 56.1(b)(3)(C) ¶ 4.)

4

Around the end of April 2008, Jay Werner (Vice President of Operations) and Snyder came to Channahon to meet with Myers to discuss routing of deliveries, delivery performance, and the current state of the territory. (Def.'s 56.1(a)(3) ¶¶ 3, 13.) Werner reviewed the cost and service metrics. (*Id.* ¶ 15.) Given that the area would have a tough time hitting both metrics, Werner told Snyder and Myers to concentrate on improving service to get it "built back up" and then focus on cost. (*Id.*) Snyder understood Werner's comments to be made with a tone and "call of urgency" that improvement needed to happen. (*Id.* ¶ 16.)

Myers concedes that operations would have been smoother after Peck's departure if Myers had previously learned Roadnet and cross-trained with Peck. (*Id.* ¶ 20.) Myers also does not dispute that the primary contributing factor to the poor service levels was understaffing in all territories and that several months prior to entering peak season, Myers had been instructed to focus on being sufficiently staffed. (*Id.*)

*Myers' Report of Drivers Banking Hours*

In May 2008, when Myers was attempting to route deliveries in Minnesota to meet customer demands, he spoke separately with two drivers in Minnesota, Erich Olsen and Steve Sarbaugh. (*Id.* ¶ 18.) Myers was attempting to route the drivers efficiently to limit their hours, but the drivers told Myers, "[N]ot to worry about the hours, that they would take care of them, but they would get the work done." (*Id.*) Myers "told them that was not acceptable. And they had mentioned to [Myers] they had done it in the past." (*Id.*) From this statement, Myers understood that Olsen's suggestion would "put him over hours" in violation of the Department of Transportation ("DOT") regulations regarding hours of service. (*Id.* ¶ 19.)

5

Within a day or so, Myers told Snyder "exactly" what the drivers reported to him regarding potential DOT hours-of-service violations and the "banking of hours" and that Myers had instructed the drivers to cease such activity. (Pl.'s 56.1(b)(3)(C) ¶ 8.) Snyder told Myers it was Myers' responsibility to manage the drivers and did not say anything to suggest that Myers should allow drivers to violate regulations or bank hours, or that what the drivers had suggested was acceptable. (*Id.*) Snyder understood "banking hours" to mean "having drivers or having employees work, that are hourly employees, not reporting those hours to payroll, holding those hours, and then giving them time off at a later date." (*Id.*)

Myers testified that very soon after his conversation with Snyder, he and another employee, Keith Romac, purchased a GPS device that could track movements on a truck for a given day in order to monitor potential hours-of-service violations.

*Myers' Performance May 2008*

On May 28, 2010, two days after Memorial Day weekend, Myers asked to take three days off work in June and ten days off in July. (*Id.* ¶ 23.) The next day, Snyder expressed concern, given that these requests fell within the peak months, and wanted to ensure that Myers' business was covered. (*Id.*)

Snyder was focused on performance during Memorial Day weekend in 2008. (*Id.* ¶ 25.) Myers claims that the May 2008 statistics showed services increased in a majority of service territories. (Pl.'s 56.1(b)(3)(C) ¶ 9.) According to Snyder, Myers' territories had slipped on their fill rates. (Def.'s 56.1(a)(3) ¶ 26.) Myers was personally handling routing for Minnesota, and its fill rate had slipped to 58 percent. (*Id.*) Snyder wrote an email to Myers, stating:

> Let's get Minnesota turned over to Dom as we had planned previously. This will free you up to concentrate on the other items I've listed out on the attachment .... Minnesota needs a concentrated effort to get it turned around, and based on the job Dom has done in Iowa, I'm confident he can provide a positive impact on Minnesota.

(*Id.*) Snyder also told Myers that service levels for the top twenty Blue Rhino customers were largely below the 92-percent target, and that the results "were below the company average." (*Id.* ¶ 27.) Snyder provided an action plan for the area, noting that he believed Myers needed to improve his timeliness, training of Romac (Peck's replacement), driver staffing, and poor service levels for deliveries, among other concerns. (*Id.* ¶ 28.)

During this time, Myers was also responsible for having processes in place to ensure deposits were made properly. (*Id.* ¶ 30.) Cash deposits in Wisconsin had not been made, and Myers traveled to Wisconsin to fix the situation. (*Id.*) Snyder's understanding was that the person responsible for making the deposits in Wisconsin had left the company, and the money was building in a drawer rather than being deposited. (*Id.*) Myers testified that he went to Wisconsin to investigate the issue as soon as it was reported to him by Snyder. (Resp. to Def.'s 56.1(a)(3) ¶ 30.) Myers further testified that he could not have known about the $17,000 in missing deposits without being told about it by Snyder. (*Id.*)

Snyder had other concerns with Myers' performance during this time. Snyder was concerned with Myers' delay in responding to questions regarding budgeting. (*Id.* ¶ 31.) Snyder observed that Romac was not performing at the expected level. (*Id.* ¶ 32.) Myers conceded he had not provided the requisite training and support to Romac. (*Id.*) Furthermore, Myers hired a driver named Bruce between March and May in 2008. (*Id.*

7

¶ 34.) Myers did not meet the driver before hiring but testified that he had four phone conferences with the driver and that the office manager for Minnesota met the driver. (*Id.*) Bruce backed a delivery truck, holding propane cylinders, into an awning over a convenience store's gas pumps; Bruce failed a drug test and subsequently resigned. (*Id.* ¶ 33.)

Myers participated in a phone conference with Werner and Snyder, and Werner was angry that Myers had not met Bruce in person. (*Id.* ¶ 35.) After this call, Werner and Snyder spoke with Suzanne Helmick, a Human Resources Manager, about Myers' performance issues. (*Id.* ¶ 36.) Snyder stated that Myers "was not engaged, he was not performing at the level that we needed to have him perform and support the business, the customers, and the employees that he led." (*Id.* ¶ 36.)

The information that Werner received in May, June, and July 2008, concerning the Channahon facility, came from Snyder. (Pl.'s 56.1(b)(3)(C) ¶ 10.)

*Myers' Leave of Absence*

Due to concerns about Myers' personal situation, Snyder and Werner decided to place Myers on a leave of absence. (*Id.* ¶ 37.) In June 2008, Snyder had a conversation with Myers about taking leave. (*Id.* ¶ 39.) Myers stated that Snyder "felt at that time that my focus wasn't on the business, that I should be taking care of my wife," and that Werner had approved the leave. (*Id.*) Snyder asked Myers to consider whether Myers wanted to return to Ferrellgas, and they would discuss it in early August. (*Id.* ¶ 40.) Myers recalls Snyder telling him "they would be happy to have him back." (*Id.*)

With Myers on leave, Snyder became involved in the direct management of Myers' area. (*Id.* ¶ 41.) A week after Myers went on leave, Romac left his job. (*Id.*

¶ 42.) Romac complained to Helmick, the Human Resources Manager that: (1) there was a lack of drivers, (2) Myers had told drivers they could have vacation during the busy season, and (3) Myers had been working drivers 75 hours per week and "banking" the hours, giving paid time off "under the table" after peak season was over. (*Id.* ¶ 43.)

Snyder learned of further performance issues with Myers. (*Id.* ¶ 46.) Snyder went through the items piled up on Myers's desk to address whatever needed action. (*Id.* ¶ 47.) Snyder discovered a mailing, necessary to renew Ferrellgas's business license with the Village of Channahon, that appeared to be expired, causing Snyder to believe that Ferrellgas was operating without a license until Snyder renewed it. (*Id.*) Myers claims that the Village of Channahon had a practice of sending renewal forms late and had sent the renewal forms later in 2008. (Resp. to Def.'s 56.1(a)(3) ¶ 47.)

Snyder also observed that Myers had failed to properly manage the Call Center, which handles customer calls raising issues. (Def.'s 56.1(a)(3) ¶ 48.) Proper management requires updating the status of calls and scheduling delivery dates based on the calls, and Snyder did not believe that this was occurring at a satisfactory level. (*Id.*) Snyder also believed that there were open calls in Chicago, dating back to September and December 2007, in Wisconsin that required attention. (*Id.* ¶ 49.)

Also during this time, one of the Blue Rhino's largest national chain customers accused a Blue Rhino driver of making sexually harassing comments to one of the customer's employees. (*Id.* ¶ 50.) The driver had made several inappropriate comments to a married employee of the customer, including saying, "I know you are married but are you looking for a sex buddy?" (*Id.*) Snyder investigated the driver and found that there were three prior instances of sexual harassment by this driver. (*Id.* ¶ 51.) None of these

9

instances were brought to the attention of Human Resources. (*Id.*) Myers claims that he filed a report in Ferrellgas's computer system but that there was no specific policy in place regarding handling of such complaints. (Resp. to Def.'s 56.1(a)(3) ¶ 51.)

*Myers' Employment is Terminated*

Snyder communicated with his supervisor, Werner, and Helmick, the Human Resources Manager, about Myers' performance issues. (*Id.* ¶ 53.) Snyder came to believe that Myers was giving his employees a lack of support, and Ferrellgas had lost confidence in Myers' judgment and his ability to run its business; therefore, the three of them decided to terminate Myers' employment. (*Id.*)

Snyder prepared a memo and evaluation explaining Ferrellgas's view of Myers' performance and the reasons for ending his employment. (*Id.* ¶ 54.) Overall, Snyder stated that: Ferrellgas had lost confidence in Myers' ability to manage his area in an effective and profitable manner; Myers' service levels fell below target in his 2007 performance; Myers had failed to staff his area with enough drivers; poor routing practices caused delivery costs to be unacceptably high in the Chicago area, the variance between budget and costs was the largest in the company; failing to renew Ferrellgas's business license with the Village of Channahon; failing to manage proper handling and deposits of cash; banking hours for drivers; and an inadequate response to prior harassment allegations. (*Id.* ¶¶ 54-56.)

In August 2008, Snyder met with Myers and told him his employment was terminated. (*Id.* ¶ 57.) Myers responded that he may have an opportunity with the government and had applied for the job two days prior, on July 28, 2008. (*Id.*)

*Myers' Actions After Termination of his Employment*

After his termination, Myers wrote to Steve Wambold, the President of Ferrellgas, to complain about his termination. (*Id.* ¶ 58.) In this letter, Myers attached an explanation, responding to Snyder's complaints in the termination memo. (*Id.*, Ex. 26.)

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not sufficient to oppose a motion for summary judgment; nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (internal citation omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## ANALYSIS

Myers has conceded that he failed to prove his age-discrimination claim; therefore, only his retaliatory-discharge and Whistleblower Act claims remain to be resolved on summary judgment.

*Retaliatory Discharge (Count III)*

Myers alleges that he became aware of persistent violations (referred to as the "banking of hours") of federal and state regulations pertaining to hours of service motor carriers and drivers by Ferrellgas truck drivers. (Compl. ¶ 35.) Specifically, the U.S. Department of Labor promulgated restrictions relating to the hours of service of motor carriers and drivers; specifically, that drivers cannot work more than 60 hours over a seven-day period. 49 C.F.R. ¶ 395.1. The Illinois Department of Transportation adopted and incorporated the federal regulations. 92 Ill. Adm. Code. § 395.2000(a). Myers alleges that after reporting the violations of federal and state transportation regulations to Snyder, he was asked to take a leave of absence, and his employment was eventually terminated. (Compl. ¶ 39.) Myers alleged that the termination of his employment violates a clear mandate of the public policy of ensuring safety on Illinois highways. (*Id.* ¶ 48.)

Although in Illinois employment is usually at will, one exception is that "[a] discharged employee may sue her employer for the common-law tort of retaliatory discharge if her discharge was in retaliation for certain actions that are protected by public policy of Illinois." *Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 277 F.3d 936, 940 (7th Cir. 2002).

To prove a common-law claim of retaliatory discharge, an employee must demonstrate "that (1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy." *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. 2009). A retaliatory discharge claim requires causation, where "the ultimate issue to be decided is the employer's motive in discharging the employee." *Hartlein v. Illinois Power Co.*, 601 N.E.2d 720, 730 (Ill. 1992). "The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." *Id.* at 728.

Ferrellgas argues that Myers cannot prove that he engaged in protected activity for two reasons. First, Myers lacks sufficient evidence that he raised issues regarding DOT violations. Myers testified that in mid-May 2008, two drivers, on separate occasions, reported to Myers that they would meet service goals and for Myers "not to worry about the hours" because "because they would take care of them." The drivers offered to make additional stops on their routes, which was outside the routes set by Roadnet, in order to meet service goals. Myers testified that if a driver went outside his set route, "it would put him over his hours." Myers understood this to mean that the drivers would violate the DOT service-hours requirement and then "bank" those hours for payment on subsequent paychecks as to conceal the DOT violations. Myers told the drivers that such activity was unacceptable and that they were to follow their assigned routes. Myers then called Snyder and advised Snyder "exactly" what the drivers told him and his intended action.

Ferrellgas argues that Snyder understood Myers as discussing a "wage and hour issue, not a DOT safety issue." (Reply at 4.) Specifically, Ferrellgas argues that Snyder

13

understood that a wage and hour violation was occurring, which meant that drivers were not accurately reporting their hours worked and are improperly holding hours for pay later, in violation of 820 ILCS 115/1.

But there is a material issue of fact with respect to whether Snyder understood Myer to be reporting DOT violations and, therefore, whether Myers was engaging in protected activity. As Myers testified, he told Snyder "exactly" what the drivers told him, which, as Myers testified, was that he believed the drivers had and intended to violate DOT hours-of-service requirements. Furthermore, Snyder wrote in Myers' termination memo that the banking of hours was an "unacceptable company practice and violated federal and state labor laws." A reasonable jury could infer, based on this evidence, that Snyder understood Myers to be stating that DOT hours-of-service requirements were being violated by the drivers.

Second, Ferrellgas argues that Myers cannot show that he engaged in protected activity because he was involved in the misconduct he reported. (Mot. at 11.) Myers concedes that participation in the wrongdoing that is being reported is a defense to the second prong – engaging in protected activity – of a retaliatory discharge claim. (Resp. at 5.) *See also Hubert v. Consol. Med. Labs*, 716 N.E.2d 329, 335 (Ill. App. Ct. 1999) (*Hubert*). Ferrellgas, however, has not pointed to sufficient evidence that Myers was involved in the reported misconduct. Furthermore, Myers testified that very soon after his conversation with Snyder, he and another employee, Keith Romac, purchased a GPS device that could track movements on a truck for a given day in order to monitor potential hours-of-service violations. From this, a reasonable jury could infer that Myers did not participate in the misconduct he reported.

14

In addition, the authority upon which Ferrellgas relies to support its argument is distinguishable. Ferrellgas relies on *Hubert*, but in *Hubert*, the employee that brought the retaliatory-discharge claim admitted that she acquiesced and participated in the misconduct that she reported. Therefore, because there was an admission of wrongdoing, the court held there was no material question of fact regarding the plaintiff's involvement in the misconduct. Next, Ferrellgas relies on *Mousavi v.Parkside Obstretics, Gynecology & Infertility*, No. 10 C 4765, 2011 WL 3610080 (N.D. Aug. 16, 2011) (*Mousavi*), to argue that Myers was simply performing his job duties by reporting misconduct and therefore did not engage in protected activity. Ferrellgas's reliance on this case is also misplaced. In *Mousavi*, the plaintiff brought her retaliatory-discharge claim in the context of the Fair Labor Standards Act ("FLSA"). In granting summary judgment in favor of the employer, the court relied on FLSA precedent that is clearly not applicable to Myers' state common-law claim.

Last, Ferrellgas argues that Myers cannot demonstrate a causal link because there is a "substantial" time lapse between Myers' report to Snyder and Myers' termination. But the record evidence does not support this argument. Myers reported the DOT hours-of-service violations to Snyder in mid-May 2008, Myers was put on leave in June 2008, and Myers was terminated in August 2008. By contrast to the cases cited by Ferrellgas in which there was at least a four-month temporal gap between the protected activity and adverse employment action, there is no substantial temporal gap in this case.

In addition, Ferrellgas argues that the company was concerned with Myers' performance both before and after his protected activity. (Mot. at 14.) Ferrellgas has set forth sufficient evidence from which a reasonable jury could conclude that Myers'

15

performance was deficient even before he reported the DOT service-hours violation. But Myers has pointed to sufficient evidence, rebutting this view of the record, from which a reasonable jury could conclude otherwise. For example, Myers received a positive performance review from Snyder in April 2008, and the May 2008 statistics provided by Ferrellgas and testified to by Snyder indicated improvement in percentage of service goals in May 2008 in 67 out of 100 service areas of the Channahon facility.

Based on the evidence, a reasonable jury could return a verdict in favor of Myers on his retaliatory-discharge claim. Therefore, Ferrellgas's Motion for Summary Judgment is denied with respect to Count III.

### Illinois Whistleblower Claim (Count II)

The Whistleblower Act provides that "[a]n employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a state or federal law, rule or regulation." 740 ILCS 174/20. "[I]n order to sustain a cause of action under the Act, a plaintiff must establish that (1) he refused to participate in an activity that would result in a violation of a state or federal law, rule, or regulation and (2) his employer retaliated against him because of that refusal." *Sardiga v. Northern Trust Co.*, 948 N.E.2d 652, 656-57 (Ill. App. Ct. 2011).

A Whistleblower Act claim requires the plaintiff to show that refusal to participate in an illegal activity caused her employer to retaliate against her. *See Robinson v. Stanley*, No. 06 C 5158, 2011 WL 3876903, at *5-7 (N.D. Ill. Aug. 31, 2011) (analyzing retaliatory-discharge claim and Whistleblower Act claim similarly).

Both parties have argued the retaliatory-discharge and Whistleblower Act claims together, thus indicating that neither believes the Court should analyze this claim

differently from the common-law retaliatory-discharge claim. Therefore, for the reasons stated above, summary judgment is denied on Ferrellgas's Motion for Summary Judgment as to Count II because there is evidence from which a reasonable jury could conclude that Myers was terminated in retaliation for reporting DOT violations.

## CONCLUSION

For the reasons set forth above, Ferrellgas's Motion for Summary Judgment is granted with respect to Count I and denied as to Counts II and III.

Date: 4-12-12

JOHN W. DARRAH
United States District Court Judge